UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW FRANCO,

    Plaintiff,

v.

SMARTSHEET INC., A domestic corporation,

    Defendant,

---

MICHAEL L. PITT (P24429)
BETH RIVERS (P 33614)
Pitt, McGehee, Palmer, Bonanni & Rivers PC
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com

---

## COMPLAINT AND JURY DEMAND

Plaintiff, Matthew Franco, brings this action for wrongful discharge under the Family and Medical Leave Act against Defendant Smartsheet Inc. ("Smartsheet" or "Company" or "Employer") and states as follows:

### JURISDICTION, VENUE, AND PARTIES

1. This wrongful discharge case asserted by Mr. Franco is based on retaliation and interference brought pursuant to the Family Medical Leave ACT ("FMLA" or "ACT"), 29 U.S.C. 2601 *et seq*.

2. The jurisdiction of this Court over this controversy is based on 28 U.S.C. §1331, to enforce the provisions of the FMLA.

3. Venue is proper pursuant to 28 U.S.C. §1391(b) because the events giving rise to this cause of action occurred in this district and division, and all parties reside in or operate within this district.

4. Smartsheet Inc., founded in 2005 and headquartered in Washington state, is a publicly traded technology company which provides to its customers a cloud-based platform for the execution of work.

5. The following individuals, although not named as Defendants, at all times material hereto, held supervisory and/or administrative positions at Smartsheet that affected key decisions in the events described in this Complaint:

    (a) Feridoon Mr. Malekzadeh ("Mr. Malekzadeh"), Vice President

    (b) Robyn Rossi ("Ms. Rossi"), Principal HR Business Partner

    (c) Douglas Mr. Pyle ("Mr. Pyle"), Senior Director of Experience Design

    (d) Gavriella Gold ("Ms. Gold"), HR Business Partner

    (e) Courtney Boyer ("Ms. Boyer"), Senior Benefits Specialist

    (f) David Pessis ("Mr. Pessis"), Vice President, Product

**STATEMENT OF FACTS**

6. On November 4, 2019, Mr. Franco accepted an offer where he secured employment as Senior UX Program Manager at Smartsheet.

7. Mr. Franco reported to Ms. Kit Unger, Senior Director of Experience Design, from November 18, 2019, through October 16, 2020.

8. On August 3, 2020, Mr. Mr. Malekzadeh joined the Company as Vice President of Experience Design and would be who Mr. Franco reported to for a short while after Ms. Kit Unger left the company on October 16, 2020.

9. On January 11, 2021, Mr. Franco began reporting to Mr. Pyle, who was hired to replace Kit Unger as Senior Director of Experience Design.

10. On February 3, 2021, Mr. Franco asked Mr. Malekzadeh to attend his performance review as Mr. Pyle had only been at the company for 3 weeks of the annual review period, concerning Mr. Franco that Mr. Pyle would not be in a position to provide an accurate assessment of Mr. Franco's performance.

11. Mr. Malekzadeh agreed to attend the virtual performance evaluation with Mr. Pyle and Mr. Franco.

12. On March 31, 2021, Mr. Pyle conducted the performance review without Mr. Malekzadeh's involvement, and the meeting turned hostile. Mr. Pyle was very critical of Mr. Franco without giving specifics, raised his voice, performed rude gestures like putting his hand up to the screen and camera to block out Mr. Franco's face shouting "Stop Talking, Stop Talking." Mr. Pyle never sent his notes from the meeting to Mr. Franco as he promised he would.

13. During the same aforementioned meeting, Mr. Pyle also informed Mr. Franco that Smartsheet was giving him 991 restricted stock units and a bonus of $17,760, seemingly in contradiction to his own criticism of Mr. Franco's performance.

14. On May 13, 2021, Mr. Franco had a one-on-one meeting with Mr. Pyle where Mr. Pyle acted inappropriately again. Mr. Pyle recommended Mr. Franco take critical thinking, management, and time management courses, seemingly insulting Mr. Franco. When Mr. Franco tried to inquire about the criticism, Mr. Pyle again held his hands up to the screen and said "Stop talking. Just take the feedback" and ended the call abruptly.

15. After his meeting with Mr. Pyle, Mr. Franco met with Brian Monzingo, Principal Manager of the Design System team. During this meeting, Mr. Franco told Brian about the

challenges he was facing with Mr. Pyle and the toll it was taking on his mental health. Mr. Franco asked Brian Monzingo if he would be willing to have Mr. Franco report to him. Mr. Monzingo said he would be willing to have Mr. Franco report to him. Mr. Franco told Mr. Monzingo that he was going to use his previously scheduled personal time off to recover and then address the issue with HR upon his return.

16. On May 17, 2021, Mr. Franco took paid time off to move his family from Washington state to Michigan.

17. On June 1, 2021, Mr. Franco returned to work from his leave and reached out to Ms. Rossi to schedule a time to discuss personnel issues, including mental health leave options.

18. On June 2, 2021, Mr. Franco had a virtual meeting with Ms. Rossi. At that meeting, Mr. Franco shared his negative experiences with Mr. Pyle and described the serious impact those negative experiences were having on his mental health, including a panic attack he experienced the Saturday before his return to work.

19. Mr. Franco shared with Ms. Rossi his reporting to Mr. Monzingo as a potential solution.

20. Ms. Rossi told Mr. Franco to reach out to Ms. Boyer for more information on leave options and she requested Mr. Franco to schedule another meeting with Rossi, as she was concerned with the behavior he was reporting.

21. On June 2, 2021, Mr. Franco had a separate, previously scheduled meeting with Melissa Hamel to discuss the life insurance eligibility form for his spouse, Johanna. During this meeting, Mr. Franco discussed the challenges he was experiencing and also inquired about mental health leave and benefits.

22.     On June 2, 2021, Mr. Franco established a professional relationship with a qualified mental health specialist. Mr. Franco continued in this professional relationship with his mental health provider receiving mental health therapy on June 15, 23,28,29 and July 14,27 and August 19, 2021.

23.     On June 4, 2021, Mr. Franco met with Ms. Rossi again to provide specific examples of Mr. Pyle's egregious behavior and discussed various mental health leave options.

24.     Ms. Rossi indicated that she would have to go to Mr. Malekzadeh with these concerns as the behavior that Mr. Pyle exhibited was concerning.

25.     Mr. Franco expressed fears of retaliation by Mr. Pyle if Mr. Pyle learned of these discussions, but Ms. Rossi assured him that this would be done anonymously.

26.     On June 4, Ms. Rossi recommended a "transition plan" for Mr. Franco to negotiate a voluntary exit from Smartsheet instead of pursuing any mental health leave options.

27.     After his June 4 meeting with Ms. Rossi, Mr. Franco sent her the following message via Google Chat: "Thank you for meeting with me today. During our chat, I got a little nervous. I want to figure out a solution to help things improve. I am open to ideas but I do not want to lose my job over this discussion. I just know things could and should be better than they are" to which Ms. Rossi replied, "Hi - I was just brainstorming options we could consider. That's all."

28.     On June 7, 2021, Mr. Franco met with Ms. Boyer to discuss mental health support, benefits, and leave options. Mr. Franco informed Ms. Rossi of this meeting.

29.     On June 9, 2021, after more than 60 days from his annual review session with Mr. Pyle, Mr. Franco received notes critical of his work performance. Mr. Franco forwarded Mr. Pyle's notes to Ms. Rossi and Ms. Gold.  In an email to Mr. Franco, Ms. Gold said "Hey Matthew-I hope

you get the rest you need….If you need take mental health time again in the future, no need to CC the HRBPs :) just please make sure to enter it into Workday as "incidental time."

30. On June 10, 2021, Mr. Franco took a mental health day, which was properly communicated to Ms. Gold and Mr. Pyle.

31. On June 15, 2021, Mr. Pyle had a virtual one-on-one meeting with Mr. Franco. Mr. Pyle sent Mr. Franco an email riddled with inaccuracies and multiple false accusations. Mr. Franco responded professionally to what appeared to be a "set-up" to drive him from the Company with a series of false assertions and forwarded the conversation to Gold.

32. On June 18, 2021, Rossi informed Mr. Franco that she had shared his concerns regarding Mr. Pyle's behavior with Mr. Malekzadeh.

33. Mr. Franco asked Rossi if she knew whether Mr. Malekzadeh would share those concerns with Mr. Pyle because, as Mr. Franco explained to Rossi, Mr. Pyle seemed "harsher" with him after he made the complaint to Ms. Rossi. Ms. Rossi failed to respond to this inquiry.

34. On June 21, 2021, Mr. Franco met with Ms. Gold, and informed her that he was exploring mental health leave options.

35. Mr. Franco also shared the option of reporting to Mr. Monzingo as a potential solution.

36. Although Ms. Gold stated that she normally encourages mental health leaves when necessary, she too suggested a voluntary separation exit strategy as a solution. Mr. Franco made it clear to Ms. Gold that he preferred to stay with the Company.

37. On June 24, 2021, Ms. Gold informed Mr. Franco that she requested Mr. Pyle to cancel his one-on-one meeting with Mr. Franco and that she was in the process of exploring a new assignment and reporting relationship for him.

38. On June 25, 2021, Ms. Gold informed Mr. Franco that he would now be reporting directly to Mr. Malekzadeh. Ms. Gold also instructed Mr. Franco to review roles he may be interested in at the company before the two of them meet with Mr. Malekzadeh.

39. Ms. Gold informed Mr. Franco that she determined that Mr. Pyle had communication issues which "need to be addressed" but that no laws or Company policies had been violated. When asked if he wanted to file a formal complaint, Mr. Franco declined.

40. On June 29, 2021, Mr. Franco met with Mr. Malekzadeh and Ms. Gold where Mr. Malekzadeh formally apologized for Mr. Pyle's behavior.

41. Mr. Malekzadeh and Ms. Gold asked Mr. Franco what he suggests for his role. Mr. Franco proposed a supporting role with specific examples of the type of work and value he could deliver while the Company tried to find a long-term solution. Mr. Malekzadeh would not consider it.

42. Mr. Malekzadeh and Gold discussed various assignment options and again raised the prospect of Mr. Franco voluntarily exiting the Company, to which he again declined as a solution and voiced his strong preference to remain with the Company.

43. From June 29, 2021 to July 30, 2021, Mr. Franco applied for three posted company positions, for which he went through the interview process. Mr. Franco was ultimately not offered any of the available positions.

44. On June 30, 2021, Mr. Franco met with Lauren O'Gorman, Senior Manager, Customer Excellence PMO to discuss the Senior Manager, Transformation Office role. Ms. O'Gorman agreed Mr. Franco could be a fit for the role and decided to have him go through the final stage of the interview process.

45. On July 12, 2021, Mr. Franco interviewed with Victoria Azzaline (Senior HR Business Partner), Carlee Crane (Manager, Customer Program Operations), Kamille Gaston (Customer Excellence Transformation Manager), Adam Schilke (Senior Director, Global Consulting), Chris Dowse (VP, Customers Outcomes Journey), and Ms. O'Gorman for the Senior Manager, Transformation Office role. Mr. Schilke and Ms. Crane both clearly expressed their belief that Mr. Franco was a good fit for the role.

46. During his interview, Mr. Dowse expressed excitement to discuss the Value Strategist role on his team with Mr. Franco in the coming days. The Value Strategist role was one of the three roles Mr. Franco had applied to.

47. Later that same week, Mr. Franco received an email from Ms. O'Gorman stating that he did not get that role.

48. That same week, Mr. Franco received an email from Mr. Dowse hours before his scheduled interview. Mr. Dowse canceled the interview stating he was moving forward with another candidate.

49. On July 26, Mr. Franco met with David Pessis, VP of Product, to discuss the Accessibility Product Manager role that had been recently approved for the Product Management department. Mr. Franco had been involved with accessibility work at Smartsheet and was at the time managing the accessibility vendor, and multiple colleagues advocated for Mr. Franco in this role. Mr. Pessis agreed that Mr. Franco could be a good fit for the role and told Mr. Franco he would speak with HR about opening the role since the role was approved for the following year and not the current year.

50. The following day Ms. Gold informed Mr. Franco that the "headcount was not approved" for this position and that this position could not be filled this year.

51. On August 2, 2021, Ms. Gold verbally informed Mr. Franco that he would be involuntarily separated from the Company after failing to find a different role he could perform. Later in the day, Mr. Franco received a Separation Agreement dated August 16, 2021.

52. Ms. Gold said that the reason for Mr. Franco's separation was Mr. Franco's supposed dissatisfaction with the role and their inability to find a new position for him.

53. On August 25, 2021, Mr. Franco saw a new job posting for a Principal Manager, Accessible Experiences on the Smartsheet careers website. The posting noted that the position was in the Experience Design department, which is led by Mr. Malekzadeh, rather than the Product Management department.

54. On September 9, 2021, Mr. Franco was informed by a reliable source within the Company that on September 7, 2021, Mr. Pyle had informed the team that the Principal Manager, Accessible Experiences job posting was temporarily taken down for "HR reasons". Mr. Franco's source said to him "I assume [the temporary take down] has something to do with your situation."

55. As a direct and proximate result of the aforementioned wrongful actions of the Defendants, Plaintiff has suffered the following injuries and/or is entitled to:

    (a) Lost salary and wages;

    (b) Lost benefits including valuable Company stock entitlements;

    (c) Liquidated damages because of Defendants' reckless and willful disregard of Plaintiff's protected rights;

    (d) Attorney fees and costs; and

    (e) Other elements of damages to be determined.

## COUNT I
## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA")

56. Plaintiff incorporates by reference all the allegations contained above as though stated in full herein.

57. At all times relevant hereto, Plaintiff was an employee and Defendant an employer within the definition pursuant to the Family and Medical Leave ACT ("FMLA"), 29 U.S.C. §2601, et seq.

58. Plaintiff fell within the protection of the ACT as a person with a serious health condition. 29 U.S.C. §2612(a)(1)(C).

59. At all times relevant hereto, Plaintiff suffered from a serious health condition in that he had a mental condition that created extreme stress and anxiety for him.

60. Pursuant to the ACT, Defendant had an obligation to inform Plaintiff of his rights under the FMLA.

61. The employer had a duty not to retaliate against Mr. Franco because he inquired of his FMLA rights, provided information to the employer in connection with the exercise of leave rights and announcing his intention to secure a mental health leave protected by the FMLA.

62. The Sixth Circuit Court of Appeals has recognized that an employee who is discharged an in retaliation for *intending* to take a statutorily protected leave has stated a viable cause of action against his or her former employer under the FMLA. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309,314 (2001).

63. The regulations governing the administration of FMLA provide that an employer is prohibited from discharging an employee because the employee has given, or is about to give, any information relating to a right under the ACT. 29 C.F.R. § 825.220.

64. The actions of the Defendant, individually and through its agents as set forth herein, clearly evidence a deliberate plan and effort on the part of the Defendants to interfere with and retaliate against Mr. Franco exercising his rights under the FMLA, including but not limited to the following:

    (a) Terminating him after he expressed his intention to take a mental health leave of absence protected under the ACT.

    (b) Terminating Mr. Franco after he provided information necessary to secure a right guaranteed under the ACT.

    (c) Suggesting to Mr. Franco that leave the company in lieu of taking FMLA leave for his mental health.

    (d) Forcing Mr. Franco to separate from the company when he refused to do so voluntarily after inquiring about FMLA leave.

65. Pursuant to the ACT, Defendant had an obligation to provide Plaintiff with up to 12 weeks of continuous or intermittent leave for a serious health condition which rendered Plaintiff unable to perform the functions of his position.

66. The reasons articulated for Mr. Franco's termination are false and a pretext for the retaliatory nature of his discharge.

67. Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by terminating Plaintiff's employment for requesting and/or inquiring about FMLA rights and/or providing information about a FMLA leave.

68. As a direct and approximate result of Defendant's violations of the FMLA, Plaintiff has suffered injury as alleged in paragraph 41.

Accordingly, Plaintiff respectfully requests this Honorable Court grant the following relief:

(a) An order requiring that Plaintiff be restored to his former position or a comparable position;

(b) An Order of this Court awarding Plaintiff liquidated damages in accordance with the FMLA;

(c) An Order of this Court awarding Plaintiff compensatory damages in an amount in he is found to be entitled to;

(d) An award of actual attorney fees; and

(e) Any further relief that this Honorable Court deems equitable or just.

        Pitt, McGehee, Palmer, Bonanni & Rivers PC

        By: */s/ Michael L. Pitt*
        Michael L. Pitt (P24429)
        Beth Rivers (P 33614)
        Attorneys for Plaintiff
        117 W. Fourth Street, Suite 200
        Royal Oak, Michigan 48067
        (248) 398-9800
        mpitt@pittlawpc.com
        brivers@pittlawpc.com

Dated: October 29, 2021

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW FRANCO,

    Plaintiff,

v.

SMARTSHEET INC., A domestic corporation,

    Defendants,

---

MICHAEL L. PITT (P24429)
BETH RIVERS (P33614)
Pitt, McGehee, Palmer, Bonanni & Rivers PC
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com

---

## DEMAND FOR JURY BY TRIAL

Plaintiff, Matthew Franco, by and through his attorneys, Pitt McGehee Palmer Bonanni & Rivers, P.C., hereby demands a trial by jury of all issues in the within cause of action.

    Pitt, McGehee, Palmer, Bonanni & Rivers PC

    By: */s/ Michael L. Pitt*
    Michael L. Pitt (P24429)
    Beth Rivers (P 33614)
    Attorneys for Plaintiff
    117 W. Fourth Street, Suite 200
    Royal Oak, Michigan 48067
    (248) 398-9800
    mpitt@pittlawpc.com
    brivers@pittlawpc.com

Dated: October 29, 2021